If it pleases the Court, I'm James Lowe, appearing on behalf of Akanoc, Steve Chen, and Managed Solutions. I would appreciate reserving five minutes of my time. Just keep an eye on my clock. Your Honors, the case in front of you is a rather unusual one. It concerns a French company that really was concerned about actions in China that then sued an American ISP because it alleges that they contributed to trademark and copyright infringement. But the substantial part of the conduct about which Vuitton complains, the direct infringement, actually occurred in China outside of the jurisdiction of the United States. Well, that's what happens with tributary and franchise infringement. I understand. Sometimes you can't reach the direct infringer, so you go after the intermediary. My point simply, Your Honor, is that the conduct of the defendants in this case was very limited in nature. At most, they had on their servers — Well, when you say limited, you know, that doesn't help much. I mean, they made it possible for these infringing companies to sell their pirated goods to American consumers. You can call it limited, but it's sort of the way the wings are of limited importance to an airplane. Your Honor, first of all, I think there was really no evidence that any sales to Americans took place except to the investigator for Vuitton, who actually didn't buy through the websites, but he actually emailed. I don't remember that being an issue in appeal. Is it an issue in appeal as to whether there's sufficient evidence of actual infringing conduct? I don't remember. Maybe there is. Your Honor, that really is not — I focus on others. That's really just a background issue. But the point that I was trying to make is that all that happened here is that Chinese manufacturers created websites and put them on a server that was operated by the defendants. Selling infringing goods. And your client ran the service and enabled these infringers to find customers in the United States. Julie heard the evidence and found that your client acted willfully and assessed damages. I mean, you know, it's a nice Julie argument, but he lost. So why are you here? We're here, Your Honor, because the jury was misinstructed as to the law. The problem is that the jury was told essentially that likelihood of confusion was presumed as a matter of law. It was therefore never — it never made any findings concerning the likelihood of confusion as to trademark infringement. And it was told, misinstructed, we would say, about the means of infringement. For example, under trademark, saying that the servers were the means of infringement, whereas it's our position that it was the websites that were the means of infringement. The servers simply were a precondition. We're going to the distinction of the websites and the servers, but I don't understand the distinction at all. A website is not a person. It's a means by which a server interacts with human beings. And, I mean, there's also a distinction between the server and the website, as far as I can tell. Well, the infringing activity, according to Vuitton, occurred on the websites, and that's where presumably the advertising took place.  It is hosted on a server, but the server doesn't have — Take away the server, there's no website. I appreciate that, Your Honor, but the — The website is assigned an IP address. And the way people are able to view the website is because that IP address is on the server and it sends an image when people put in the name of the website. You know, there's really no distinction at all between the website and the server. They're really one and the same. Assuming that that's true, Your Honor, even so, the instructions told the jury that there was a presumption of likelihood of confusion. They were never instructed on finding of intent, and there was — we would submit no evidence of intent. Actually, Vuitton is arguing they don't have to establish intent, but I think that under the cases of this Court and the Supreme Court, you must have at least imputed intent. And I believe this Court, in terms of trademark and copyright infringement — Did they find willfulness? They did find willfulness. Isn't willfulness more than intent? Actually, no, Your Honor. That's part of the problem, that the instruction on willfulness we submit is also incorrect. It did not establish — it did not explain to the jury how to find willfulness. It did say if they intended, then you can find willfulness. And therefore, the jury did find willfulness. There's a protocol, isn't there? And, you know, this is the great commercial battle of the 21st century, the ability of the Internet to reach all across the world and the duty of courts to protect intellectual property. But there's a protocol for dealing with these situations, and that is a — the owner of a protected item sends a notice of infringement to an ISP or somebody like your client, and your client notifies the person who's putting content or links up on their website that they've received the NOI. And until they clear it with the owner, the purported owner of the mark or the right, that they won't be allowed to be up on the net. Have I generally correctly described the NOI process? Yes, Your Honor, you have. And there were NOIs sent to your client that were ignored. Your Honor, I think that's not what the evidence shows. I would direct the Court's attention to Exhibit 1598, which is at page AKA 788. It's the beginning of a 20-page list of NOIs. Give me the AR again. 788. 788? AKA 788. Okay. There are — it's the list of the approximately 100 websites. I'm sorry. This is the excess record, the supplemental excess record? It is, Your Honor. No, which one? The excess record or the supplemental excess record? It's the excess. Okay. And it's volume what? I believe it's volume 3. I believe it's volume 3, Your Honor. Let me look. Actually, it's volume 4. Okay. I'm sorry. Where is it? It's a tab what? I'm not sure what the tab is. It's Exhibit 1588. It's page 788. Are they consecutively? I believe they are. Regardless of tab? I think so. Okay. 773. 788, you say. Okay. So this is a summary of efforts made by the defendants to — Tab 73. Tab 73. Tab 73. I got it. So what — This is a summary of the defendants' efforts to deal with the NOIs, and it shows a period of time over about three years of NOIs from Bhutan to the defendants and what happened. In many cases — and this is supported by the testimony, but in many cases the NOIs were checked out by the defendants and the websites were not on those IP addresses. In other occasions they were on the IP address that was indicated by Bhutan and notices were sent to the customers because our clients are essentially wholesalers and they don't deal directly with websites. They sell batches of access to the Internet. So they would send notices to the customers. If the customers did not take those down, then the only other things that they could do, and they did, was to disable the IP address or to actually physically unplug an entire server. Now, these servers were rented to the retailers, you might say, of these people who were using the Internet, and they would buy an entire server, maybe 100 servers at a time, and each server had at least 10 IP addresses, and each of those IP addresses could host hundreds, possibly even thousands of websites. So there were many, many thousands, tens of thousands of websites on these servers potentially, and they were only, there were, as I say, about 100 IP or, I'm sorry, 100 websites about which Bhutan claimed. Roberts. Is part of your response to the question I asked that your client, in every instance that it received an NOI from Bhutan, responded appropriately? It is, Your Honor. It was their practice, and they testified that every time they got one of these complaints, they took appropriate action, they gave notice to the, to their customer. Later on, they, because this was all going on during the workup to the trial, they would take more severe action more quickly. I think eventually it got to the point where every time they got any kind of notice from Bhutan, they simply unplugged the servers before telling anybody, before doing anything about the IP address. But the only thing they could control were those IP addresses and the servers. They didn't control the websites. They couldn't control the content. They couldn't remove specific content. They could just shut it down. Could they have, after, how many of these NOIs did they receive from Bhutan? As I say, this exhibit shows approximately 100 websites, and many of them they complained about several times over a period of years, because they would come, they would go, they would come back, they would come back with different IP addresses. Many times Bhutan would complain about them, and they weren't on any of the IP addresses controlled by them. But maybe a year later they would show up again. At some point, didn't that suggest to your client that they ought to block all people purporting to sell Louis Vuitton? Well, they weren't dealing with anybody selling Louis Vuitton, Your Honor. They were dealing with third-party retailers, and these people or these websites would show up randomly from various places. Now, there may be a dozen or so from any particular customer of theirs over a period of years, but given that they were dealing with thousands of websites. Does this get to the jury instruction, I think, that your side proposed about direct control and monitoring? It does, Your Honor. Why don't you talk about that? Yes, Your Honor. We had no direct control and monitoring of these websites. The only thing that the defendants knew was when they got an NOI. Then they could check and see if there was, in fact, that website on that particular IP address. If it was, then they would take the begin this action of giving notice, disabling the IP address, and then eventually unplugging the server with repeated actions. Now, of course, Vuitton complains that they didn't do it fast enough, they didn't do it often enough, they should have fired some of their customers or some such thing, but we don't think that's what the law requires, and it's, frankly, not practical. The websites moved around from the defendant's sites to various other places, probably around the world, that they could move within a matter of 10 minutes. So it isn't that they had any real concern about what was going on with the defendants. If they got shut down, they'd just start up under a different ISP in some other part of the country or a different part of the world. Did they all come from China? All of these about which Vuitton complained came from China. And the reason, Your Honor, is that our clients had a Chinese background. They spoke and wrote Chinese, and they were able to deal with Chinese customers. So many of their retailers that they dealt with. And the reason they didn't do it fast enough is because they saw an opportunity to make some money helping people infringe. Your Honor, they didn't make any money on that. They made no money. Made no money about this at all. They printed these servers at a flat rate, about $55 to $100 per month, for a package of a big server, at least 10 IP addresses, and access to a certain amount of bandwidth on the Internet. This is standard price. They didn't get any revenue because they had infringers advertising on these websites. In fact, it cost them money because they had to constantly try to deal with all of the complaints. And they were doing that over and over and over again. They would have loved to have gotten rid of these people because it did nothing but cause them trouble, drove them out of business eventually because of this lawsuit. They certainly made no money. So they were not – it was not as if they were assisting in any way. They were used. You know, that certainly was your client's position at trial. Oh, we know nothing. You know, we're just sort of techies. We – you know, this is all business. We know it's involved and all that. But the jury looked at it and could very well decide, you know, here's a guy who decides here's a nice niche market helping Chinese companies sell infringing products to U.S. consumers. And since a legitimate web service won't host them, this is my chance to cash in on this opportunity. You know, this is – you have a jury. You know, this was argued. They presented evidence. And so the jury comes back with a pretty hefty verdict against your client. Well, they did, Your Honor, because we believe they were misinstructed as to what they needed to find. For example, direct control and monitoring, they were not instructed about that. They were instructed that there was a presumption of likelihood of confusion, which is the core part of trademark infringement. They were never told about that. I'm sorry. I thought that was our law, that when you sell a knockoff, there's a presumption of likelihood of confusion. If you sell something that is false – you know what a knockoff is, right? Yes. We're talking the same language. So isn't our law that if you sell a knockoff, there's a presumption there's a likelihood of confusion? Your Honor, I think there has to be – I think there – I think that's not entirely correct. First of all, there has to be use of that trademark by the defendant, not a third party. But that's a different question. You just slid it into a different question. We're talking about likelihood of confusion. Doesn't our law say that when you sell a knockoff, something that looks just like the mark but is not the mark? I mean, it's not made by the manufacturer. There's a presumption that there's likelihood of confusion. Under some circumstances, that could be true, but we would suggest that that is not possible. I'm sorry. What circumstances is that not true? I would say – When you sell a Rolex – a watch that says Rolex and looks like a Rolex and – But that would apply to the direct infringer. We would suggest it does not apply to a contributory infringer who is not selling, not making any money, and not controlling any of this. They are simply being used, and they're in no different position than someone who provides any service to someone selling knockoffs. So if I may – How do you deal with flea market cases, Fornovisa and – what was that? Seventh Circuit case. Well, there is – certainly those cases exist. I mean, they set up a flea market. The people set up a stand with their infringing records, right? The people running the flea market say, well, you know, I was just selling land and tickets, you know, and we held no. You've got to – when you've got – when you are aware that what people are using the flea market for is to sell infringing products, you've got to police it. You've got to look, and if the stuff, in fact, infringes, you're going to be held to be contributarily infringed. Two answers to that. First of all, the Tiffany case indicates that you don't have to be policing. But secondly, the Fornovisa case talked about the distinction between an absentee landlord and the dance hall operator. And we think that our client is in the absentee landlord position and not the dance hall operator. He didn't know what was going on. He's not like he's physically present there at the – at the flea market. If I may, I need to reserve a couple of minutes. I don't understand that answer at all. I'm sorry. I missed it completely. Your Honor, I believe that the Fornovisa case – I mean, the flea – you're not going to say the Fornovisa would come out differently if the flea market announced it. I never go there. I just rent the place. I just don't show up. You don't think – you think the case would have turned out differently by saying, oh, I don't bother to look what's being sold there? The case is – Do you think that makes a difference? No. The cases indicate that in that situation, the landlord must know of a specific individual who is infringing specifically or doing something – Well, your client is getting all these notices saying, look, infringement, infringement, infringement is going on on your service. Your Honor, there are tens of thousands of these things – websites on the servers, and there are maybe a hundred that are actually infringing. They have a general knowledge that there are going to be some bad people out there doing things, but they don't have specific knowledge, which I think the cases all require. And they have to do something more than just provide a service that they provide to the public. They have to actually assist in some way. They have to encourage it. They have to have at least imputed intent. And so the mere fact that a – that they don't see these websites as they're operating, they don't see them until they're told about them later on. So we think that this is not a situation where there's any active involvement, any intent, any imputed intent. There's no substantial – Your Honor, you have about a minute left. Your Honor, I do wish to reserve my right, my – the rest of my time, but we have briefed as well the issue of the damages which we think are excessive beyond the statutory amount. Thank you. Thank you. Good morning, Your Honors. May it please the Court. I'd like to reserve two minutes for rebuttal. My name is Andy Koobs. I'm here with my associate, Annie Wang. We represent the plaintiff, appellee, and cross-appellant Louis Vuitton in this matter. I'm glad that the counsel for the defendants started with their Exhibit 1598, which Your Honors have before you. Because in many respects it underscores many of the things about which the parties agree, and given how much disagreement there is in the briefs and in the argument, I thought that might be a fruitful place to start. It evidences, as the Court noticed, numerous specific, detailed notices evidencing actual infringement. This document was prepared by Mr. Chen, a defendant, the general manager of both of the corporate defendants. It evidences repeated notices concerning, I think the defendants' counsel said, about 100 websites during the course of the litigation. We can quibble about some of the inaccuracies on that chart. For example, the fact that not one of the 18 notices that Louis Vuitton sent before filing the litigation is listed on 1598. And the only thing we do know about those 18 notices is that they were ignored by the defendants. The limited amount of testimony and evidence that Louis Vuitton was able to develop concerning their practices before the litigation was filed was that these notices were simply put on a desk and ignored. And even after the litigation, what 1598 shows is that these notices still did not result in a termination of the specific infringing activity about which the defendants were given notice over a period of years. And what discovery revealed in this case was that the hundreds of websites that were the subject of these notices were, in fact, only the tip of the iceberg, because the defendants' experts and the plaintiffs' experts agreed that the five servers that were imaged in the course of discovery reflected thousands of websites. And the defendants' – I'm sorry, Louis Vuitton's investigator, who reviewed hundreds of websites hosted by the defendants, found not one that offered legitimate products. This is specifically the kind of pervasive and persistent conduct that needs to be addressed by the principles of contributory liability that have been articulated by this Court. Scalia. One of the problems with – in this whole area is that the Internet moves at the speed of light, and business moves a little slower than that. I think back to this case about three years ago where an Italian court convicted three officials of Google for not taking down a video that was on YouTube about the harassment of an autistic child. And one of the things Google said in defense was that they had 21,000 images a year, and it was impossible for them to effectively block them all, that they could proceed based on notice. I take it that your argument is this is not that kind of a case, that sufficient notice was provided, sufficient inactivity for the jury to consider to establish contributory mark infringement. Absolutely, Your Honor. This is not a case where we need to deal with a difficult problem on the margin involving willful blindness in Constructive Village, although there's plenty of evidence of that as well, which no doubt helped the jury in coming to its conclusion of willfulness. There is sufficient basis on the actual specific notices, numerous examples of which are included in the record that Defendant's counsel has cited to Your Honors already, to substantiate liability in this case. Let's say, and I know this is a hypothetical question, but let's say that the minute these defendants got the first NOI, they had contacted an authorized representative of your client and said, we understand completely what your concern is and we want to cooperate in any way we can, bring your tech people here and we will do anything to block this stuff. What would your client have told them? As Your Honors noted, it's speculative, but I think they would have welcomed the opportunity to work with the platforms that are an essential part of Internet commerce. Understanding that apparently there wasn't there evidence that in those instances where they did say you can't access our servers anymore, in a matter of seconds they could move to a different IP address. I think there's two different issues on this IP address, Your Honor. The first is the ability to move to a server that is owned and operated by someone unrelated to the defendants. That's a red herring. It's one of the numerous red herrings that have been thrown up in this case. That is a separate problem, which may or may not involve separate issues of liability as against a third party not here before the Court. The second issue is the movement, which did happen in this case, among IP addresses and servers controlled by the defendants. And the fact of the matter is, by focusing on specific instances of infringement at specific websites, using the specific domain names at issue, the defendants had the tools available to determine and to make sure that that activity did not resume on another server which they operated. And they had several different ways of doing this. If they unplug a particular server or they disable a particular IP address and it moves over to another server, maybe operated by the same customer, maybe a different customer, we don't have very much information about those people, the defendants still had the ability to do exactly what Louis Vuitton did when they found the repeating infringements, which is to type in the domain name and determine by pinging it, as it's shown in the record, you know, where it was hosted and whether it was an IP address which they still controlled. And they have the records to know whether or not that IP address is owned and operated by the same customer that had the original IP address or the same servers that owned the customer that was using the same server, a different server, but a different package, because we do know from the record that many of these sites were on a small handful of customers' websites and that these – some of these customers were among the defendants' best customers. So it's not surprising that they were really not eager to – Let me try to understand the architecture. Correct me if I'm wrong, but the way it works is if you type in a website, Google.com or, you know, whatever, there are servers that associate that name with a particular IP address, right? Correct, Your Honor. And so when you type in, let's say, Google or, you know, some name like that, is it translates it to a number, and that number sends a signal to a server, and there's a list somewhere, like a phone book, that says this server is located in Sasha Shach's app so many hops away. Am I correct? Essentially correct. There are registries, which is where these data is maintained. When you take – and you can change IP addresses associated with a particular server, right, or with a particular web address. With a particular domain name, yes, Your Honor. And when you do that, you have to – it takes about 24 hours to propagate all over the world. I don't know the precise timing. The servers are on the one who are being told now this web name is associated with a new IP address, right? It's fairly prompt, but whether it's 10 hours or 48 hours, I wouldn't – So if you move the IP address from one server to another, that happens instantaneously, right? I'm sorry, Your Honor? If you move the IP address itself from one server to another server, the name continues to be associated with that number, and that can happen much more quickly? The domain name changes IP address. So let's say you keep the same IP address, but you move the IP address. Instead of having it on one server, you have it on another server. Okay. And your question, Your Honor? At that point, the change happens instantaneously? I think so, Your Honor. Now, can you – the IP addresses are controlled by owners. So, for example, if you own a server, you get a block of IP addresses associated with it. Among the services the defendants provided here were blocks of IP addresses. Is it like a phone number? You can pick up your phone number and go to a – or IP address and go to a different service provider? No. You would get a different IP address from a different – You'd have to switch IP addresses. That's my understanding. So as long as you stayed with the same owner, with all the same blocks of IP addresses around, but you can't move it to a different server controlled by a different individual? That's correct. That's my understanding, at least in this instance, Your Honor, that these IP addresses to which these domain names were attached were IP addresses that had been assigned to the defendants, so that if they wanted to use an IP address belonging to a third party, or to have their domain name associated with an IP address belonging to a third party, that the assignment would change so that it would go to the – the ISP. Doesn't all of this suggest that the district court should have given the instruction on direct control and monitoring? The district court did give an instruction on direct control and monitoring, but I think there's a couple of sort of preliminary points. The first is that Louis Vuitton doesn't concede that that's an instruction that's required here. The direct control and monitoring requirement is something that comes up in connection with the provision of services specifically as a result of the decision in the Lockheed case. Lockheed cites Fonavisa, which Your Honor has already referred to, and Fonavisa doesn't talk about direct control and monitoring. And we think that that's the much more directly comparable sort of, I was going to say service provider, but goods and service provider to what the defendants provided here. Remember, in addition to the routing services and so forth, they are providing a physical space at which to host and display the infringing offers that are underlying this entire case. And if those aren't goods, I'm not quite sure what is. And if those aren't goods, I'm not sure what would be in the Internet context. So the first issue I think the Court needs to resolve in this respect is whether or not an instruction on direct control and monitoring is required at all. But then even if they conclude that it is, there was an instruction on control and monitoring, and it appears on page 10 of the jury instructions. In particular, the Court lists a number of factors that the jury is instructed to consider, and item number 4 is the degree of control that the defendants could and did exercise over its servers. And then finally, Your Honors, there's really no question that they had control here. Exhibit 1598 demonstrates that control in terms of the unplugging of IP – unplugging of servers, the disabling of IP addresses, and the testimony about the terms of service. The counsel – counsel. Yes, Your Honor. I could ask a question, please. It seems like any ISP would have control in that sense. So that the whole issue here of imposing liability on an ISP must relate to its failure adequately to respond to the NOIs. I mean, to me at least, it doesn't seem like just the fact that it could pull the ISP out of control, but it's the fact that the ISP has to be morally responsible or else every ISP would be responsible. Well, I – there's a couple of issues here. There are a number of different types of activity that fall within an ISP. This – we're specifically talking about web hosting right now. We're not talking about payment processors. We're not talking about broadband conduits. We're not talking about caching services and any of the number of other kinds of activities which are involved in the provision of Internet services. We're specifically talking about web hosting, which consists of providing the physical space for the infringing activity to occur and to provide the router and IP addresses so that Internet traffic can be directed to that activity. And to that extent, I think it does follow that a web host in that position does have the ability to control the infringing conduct, which is – comes back to the earlier issue about whether or not it's a meaningful inquiry in the context of providing goods and services as is done by the defendants in this case. You would analogize that to the – Ponevisa. To the owner of a flea market. That's correct, Your Honor. The owner of the flea market – I mean, what he can do is kick them out. That – that is the ultimate remedy and one which the defendants, frankly, failed and refused ever to apply against any of the infringers here. We've got about five minutes. I want to talk about damages, if we can. Do you have a verdict form in front of you? Yes, I do, Your Honor. Okay. Let's talk about copyright infringers. This is question 13. This is now as a – a 52. Page 12 of the verdict form. I'm sorry. Question 13 on the verdict form? Yeah. Page 12 of the verdict form. Yes, I have it, Your Honor. Okay. So the jury found Aconok, Mench Solutions, and Chen each committed a wolf infringement, right? That's correct, Your Honor. And the district court knocked out Mench Solutions, if I remember correctly. But it doesn't matter. They all were found to be – to be – to be willful infringers. And the jury – and how many copyrights were infringed? Two, Your Honor. Two. So why is the maximum amount that could be awarded $300,000, two times $150,000? It's $150,000 per wolf infringement. That's correct. And that was the award. It was 150 – Well, it was $900,000 here. Well, but it's – it's – no, it's $150,000 for each copyright. So two copyrights is $300,000, which would be the statutory maximum as against one defendant. But there were three defendants here, each of which was found separately liable. And so it's 300 times 3. Well, but they're all – they're all jointly and separately liable for – for the verdict, right? If that – well, I don't accept that conclusion, Your Honor. If that is your conclusion, then that would be correct. But the – I think the record demonstrated independent – Well, I asked you a question. I didn't ask a conclusion. I asked you a question, and you didn't give me an answer. I'm sorry. Maybe if you'd read – They're jointly and separately liable. The answer – I would answer that no, Your Honor. So – so you are not going to seek to enforce a portion of the judgment against – Each of the three. Against Chen that – that is a – and against Aconoc. Well, Managed Solutions Group is a separate issue, but yes. Essentially, we – Managed Solutions Group, the award was set aside by the district judge. But as to Aconoc and Stephen Chen, yes, Your Honor, we would enforce as to either the judgment provided, a separate finding of liability for the appropriate amounts as indicated in the verdict form as against each of those two defendants. And you'll be able to see – Counsel, if they were jointly and separately liable, then wouldn't each of the three be liable for $300,000 jointly and separately, but they wouldn't each be liable separately for $300,000? I – I agree, Your Honor. If they are jointly and separately liable, then the award would be $10,500,000 for trademark and $300,000 for copyright for a total of $10,800,000. However, there is no – We understand your position on this because your time is short. So what is your position as to the trademark damages? How did they come up with $31,000 – $31 million, $31.5 million in trademarks? There were 17 trademarks alleged on which the jury was asked to make findings. There were 15 of the 17 on which they found willful infringement. As to each of the 15, they awarded $700,000, which is a total of $10,500,000. Right. Just as they did with copyright. It was not awarded jointly and separately. Using essentially the defendant's verdict form, it was awarded separately as against each. So it was $10,500,000 as against Hackenauck and another. How can you have the same damages three times? That's a question for the jury, Your Honor. But the activity was essentially the same by the three. Mr. Chen, obviously, is in the same position as his two companies. So the fact that the amount is the same as to Chen and the two corporations shouldn't be a question, frankly. The question would be why is it the same? If the damage is the same damage, normally, like in a tort case, you couldn't recover the same damage against multiple parties. But under your theory, if there were 100 people who were liable, then could they recover 100 times $10,000,000? Your Honor, they could. And part of the thing to keep in mind here is the scope of the infringing activity that was incurring on the defendant's servers. Remember, there was activity that was occurring on Managed Solutions servers. There was activity occurring on Hackenauck servers. Often it went back and forth at different points in time. So there was an ability to find separate liability as against each of the two corporate entities. I do not have a full answer for you as to why the number would be precisely the same in both cases. But that was what the jury found, and its finding is entitled to great deference by this Court. And it might be a little bit too much deference to think the jury made separate calculations about each of the three, and they each came out to $10.5 million. Well, as I've indicated, at least as to Mr. Chen and the corporate defendants, I don't think that's a reach, because Mr. Chen was the acting officer of the corporation engaging in these activities. So the fact that the number is the same in that case, I think, is not not difficult to support. It just suggests it's the same damages, because he didn't have separate servers. You might say the corporations might have separate servers, but he didn't have separate servers. He was doing separate acts as a corporate officer, though. But could it be the same infringement? Correct, Your Honor. As Judge Gould suggested, so if you had two people conspiring to commit damage, you wouldn't normally get twice the damages. You have whatever damage you suffered. Correct, Your Honor. I would like to reserve what little time I have left. You have no time left. How would you reserve it anyway? Sorry, Your Honor, but I didn't notice the clock was going. You owe me time. Thank you, Your Honor. OK, well, here you have some rebuttal. Your Honor, very briefly, if I may go to your question about the architecture, the servers have certain IP addresses assigned to them by the ISP. And you can't pick up the IP address and assign it to a server somewhere else? No. No, I mean, no. That's like picking up a street address. You can't pick up a street address. It's essentially like a street address. So what happened is that if the IP address were disabled, then the third party customer, not the customer of Aconoc, but the customer's customer, would have to go to a different IP address, perhaps to a different ISP, in order to go online. If you look at, if I can direct your attention to Exhibit 1598, this list of NOIs, there are a number of comments here indicating different circumstances. For example, they would get a complaint and, after checking, determine that the IP address is not in range. That means not in the range assigned to these defendants. Or they would send a takedown notice. Or they would find that it was not functional. Often you'll see notes in here that it was a different IP address. So that suggests that the third party website actually came to somebody, maybe a different customer, maybe the same customer of Aconoc, and independently bought a separate new IP address that they could use. So this moved considerably. But most of the time you'll see that these are out of range, because they'd either moved before, or Bhutan was incorrect about the IP address. So you see a number of things where they keep moving around. And it is my understanding, based on the testimony of the experts on both sides during the trial, that it wouldn't take very long, perhaps 10 minutes, for a website operator, say in China, to go to a different server, a different IP address, a different ISP. It takes longer than that, because you don't propagate. You have to have all the servers in the world associate the website with a new IP address, it takes as much as 24 hours for it to propagate. I mean, it starts, it could. But as I say, I'm simply relying on the testimony that was given during the trial, and I think they indicated perhaps as little as 10 minutes. But in any case, rather rapidly. And so they keep popping up again, sort of like gophers in your backyard. You get rid of them, and then they pop up in a different hole somewhere else. But that's not an excuse for saying, just because they're going to go do something illegal somewhere else, that's not an excuse for your client to say, well, in that case, I'm not going to bother stopping them from doing my service. I absolutely agree, Your Honor. But that isn't what happened. We're trying to stop them. They constantly were trying to stop them, as that indicates. Even if there were, for example, as Votan has argued, certain written respondents. You know, you argued this as a jury. You're on rebuttal now. I'm not hearing anything, or you're abiding anything that's offensive. I don't mean to do that, Your Honor. But the point is that these are service companies. They're not selling goods. They're not attaching these to anything of their own. They're just providing a service. And this Court repeatedly has indicated that there has to be a substantial effort to assist the infringers in order to find secondary liability. That's what we're trying to do. Thank you. Thank you. The case is argued with 10 minutes. We're adjourned.
judges: Kozinski, Hawkins, Gould